611 F.2d 1122
 Kerry P. DAY, Rhett G. Campbell, Richard D. Huff, Peter H.
Luke, Paul M. Scott, James A. Terhune, on behalf
of themselves and all others similarly
situated, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 78-1092.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 15, 1980.
 
 Kenneth M. Morris, Houston, Tex., for plaintiffs-appellants.
 Robert M. Hollis, Court of Claims Section, William G. Kanter, Dept. of Justice, Washington, D. C., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of Texas.
 Before GEWIN, RUBIN and SAM D. JOHNSON, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 "Join the Navy, and see the world" was once the seductive slogan to enlistment. Service in the other branches of the armed forces may also entail assignment to distant and exotic posts. Whether on duty in the United States or at far-off bases, a commissioned officer is entitled by act of Congress to quarters "appropriate to his grade, rank, or rating and adequate for himself." 37 U.S.C. § 403(b). If these are not provided, he is entitled to be paid a monetary sum, a basic allowance for quarters (BAQ).[1]
 
 
 2
 This is a class action on behalf of all unmarried Air Force officers without dependents who were permanently stationed in Thailand and provided quarters there during the six year period from January 27, 1970 through January 26, 1976. None was on field or sea duty; and therefore, none was deprived of BAQ by the statutory exemption for military personnel so assigned, 37 U.S.C. § 403(c). Each was provided with quarters that he occupied, but the class action claims that what was supplied was not adequate and appropriate and, therefore, claims BAQ payments as provided by 37 U.S.C. § 403 for the duration of each member's permanent assignment in Thailand.[2]
 
 
 3
 Both parties were trained for lightning battles. The government sought to bomb the plaintiffs out of court by motion for summary judgment dismissing their case. It contended that each plaintiff was in fact provided some quarters and that anything actually supplied was legally sufficient under an executive order and a military regulation; alternatively, it relied on another regulation that defines all quarters containing 110 square feet of net living area (excluding bathing and toilet facilities) as adequate in Thailand. Equally determined to win quick victory, the plaintiff class countered with a motion for summary judgment on the grounds that all quarters provided were patently inadequate because 98.1% Of the buildings used to house officers in Thailand were classified in some category other than "Usable Class A (Adequate)" in the real property records maintained by the Air Force, Form 1430, and because none of the quarters met the minimum adequacy standards for bachelor quarters generally applicable when quarters are assigned in the United States.
 
 
 4
 Until September 16, 1975, each class member was provided with quarters embracing at least 110 square feet. The district court held that these were adequate as a matter of law without regard to their actual condition. On September 16, a military regulation suspended all minimum standards of adequacy. Holding that this was dictated as well as justified by military necessity, the district court also dismissed the claims subsequent to that date.
 
 
 5
 The case comes to us without any factual determinations concerning the adequacy of what was provided. We review only the summary judgment, which held, as a matter of law, that the Air Force's regulatory prescriptions were within the authority delegated by the statute.
 
 
 6
 Before discussing the two sets of rules that cover the two separate time periods, we consider the government's first-strike argument: "It is stipulated that the plaintiffs were each assigned some kind of quarters and paid no rent." The statutory section providing for BAQ gives the President power to prescribe regulations for its administration. 37 U.S.C. § 403(j). Pursuant to that grant of authority, the President issued Executive Order No. 11,157, a section of which says simply that any quarters occupied rent free at an officer's permanent station "shall be deemed . . . appropriate and adequate."[3] Therefore, the government argues, the quarters were ipso facto adequate.
 
 
 7
 The district court properly grounded this sophistry. The general rule enacted by Congress is that all officers are entitled to BAQ; there is an exception to the legislative mandate when adequate and appropriate quarters are provided. The power to make regulations defining what is adequate and appropriate is not a delegation of authority to wipe out the statute by imposing an Orwellian definition that adopts no standard at all. Regulations must be consistent with the statutory authority that alone gives them validity. Federal Maritime Commission v. Seatrain Lines, Inc., 411 U.S. 726, 746, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620, 634 (1973) (quoting Volksvagenwerk Aktiengesellschaft v. Federal Maritime Commission, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090, 1097 (1968)); Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936); United States v. Symonds, 120 U.S. 46, 7 S.Ct. 411, 30 L.Ed. 557 (1887); Real v. Simon, 510 F.2d 557, 564 (5th Cir. 1975). They may lack rhyme, and, unfortunately, sometimes are turgid, but they must be based on some kind of reason.
 
 
 8
 The government's argument in support of the nonstandard effective on September 16, 1975 is almost as untenable. Pursuant to a series of delegations of power, from the President to the Secretary of the Department of Defense, to the Secretary of the Air Force, to oversea major commands, the Headquarters for Pacific Air Forces (PACAF) waived all minimum standards for housing officers permanently stationed in Thailand on September 16, 1975. This was, the district court found, "Apparently done as a result of the imminent discontinuance of American use of Royal Thai Air Force bases." (Emphasis supplied.) It considered this change a matter of military necessity, hence valid.
 
 
 9
 Even assuming the validity of the factual premises, we must reach a different conclusion. The Congressional command is to pay BAQ to all those not on field duty unless they are provided with quarters adequate and appropriate. Military necessity justifies assignment of personnel to field duty, but the statute contains no military-necessity exception from the BAQ requirement for those assigned to a permanent station wherever that station may be or under whatever conditions the assignment may occur. The statute did not authorize the Chief Executive to suspend the payment of BAQ if political or military exigencies made it difficult or inexpedient to provide what was adequate and appropriate; nor did it authorize him to accomplish the same result by sprinkling a few regulatory words.
 
 
 10
 There is, therefore, no real difference between the dogmatic Executive Order No. 11,157 that "everything provided is adequate" and the PACAF order that "after September 16, everything in Thailand is adequate," save that the later order deals with a specific geographic area and a shorter time period. The result decreed in 1975 was as imperious as the universal command that anything the military provides suffices; neither defines what is adequate or appropriate in any fashion or attempts in any way to meet the implicit statutory standard. See United States v. Cartwright, 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); Cf. Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); Bell v. United States, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961).
 
 
 11
 Let us turn now to the period before September 16, 1975. In Executive Order No. 11,157 § 407 the President redelegated his authority under 37 U.S.C. § 403(j) to the Secretary of Defense and the Secretaries of the various services. Pursuant to this directive the Secretary of Defense promulgated Department of Defense Instruction No. 4165.47 (April 6, 1967; revised May 12, 1972; revised Oct. 23, 1974) defining the minimum standards of adequacy for bachelor officers' housing. This Instruction establishes standards applicable worldwide "unless specific exceptions are made by the Head of the DoD (Department of Defense) Component concerned." Id. P IV(B) (May 12, 1972).[4]
 
 
 12
 The Secretary of the Air Force subsequently issued regulations requiring that officers at the pay level of 0-1 or 0-2 (1st and 2nd Lieutenants, respectively) were to receive 250 square feet consisting of a combined bedroom and living room and private bath. Officers at pay level 0-3 and higher (Captain and above) were to receive 400 square feet consisting of a private bedroom, a private bath, a shared living room and a shared kitchen. Air Force Manual (AFM) 30-7, Change 1 P 2-4 (April 26, 1974); Air Force Regulation (AFR) 30-7, Table 2-1 (May 12, 1975).[5] These same minimum standards were set by the DoD Instruction 4165.47 of May 12, 1972. They contain no reference to the physical condition of the quarters or the services provided, defining adequacy solely in terms of number of rooms and square footage. Historically, this has been the sole type of standard used by the armed forces. There was a statutory requirement that quarters be furnished at public expense at least as early as 1813; the officers' entitlements were to a certain number of rooms, nothing being said about their condition. Jones v. United States, 60 Ct.Cl. 552, 555 (1925). Ever since then, officers' entitlements have almost always been defined in terms either of number of rooms or square feet of space. See United States v. Phisterer, 94 U.S. 219, 24 L.Ed. 116 (1876) (Act of 1863); Hollister v. United States, 92 Ct.Cl. 137 (1940) (Act of 1922). The unsuitable condition of the rooms furnished generally has not been deemed a sufficient basis for a claim to payment of an allowance for quarters. See id. A regulation taking into account the type of structure, the condition of the premises, or the utilities and conveniences supplied in determining adequacy, such as the regulation considered in Lischak v. United States, 202 Ct.Cl. 598 (1973), is an historical anomaly.
 
 
 13
 In accordance with a proviso for specific exceptions contained in the DoD Instruction, the Secretary of the Air Force stated, with respect to the minimum standards of adequacy set forth by those regulations: "Oversea major commands may make appropriate reductions in these standards for areas involved in combat or contingency operations or areas directly supporting these operations." AFM 30-7 P 2-2 (Jan. 1, 1970); AFR 30-7 P 2-2 (May 12, 1975). Thailand was such an area throughout the period relevant to this appeal.
 
 
 14
 Pursuant to this delegation of authority, PACAF as an oversea major command issued a series of supplementary regulations. These PACAF Supplements established as the minimum standard of adequacy 110 square feet, exclusive of bathing and toilet facilities. Thus, while the PACAF definition reduces the space allowance it also prescribes no standards for the physical facilities in which they are located. If there is now such a regulatory embellishment, it comes only because the Air Force prior to 1970 began the practice of maintaining real property records on each building designated for use as officers' quarters. These are maintained on a form, AF Form 1430. The form provides for the designation of each building's condition as "Usable Class A (Adequate)", "Usable Class B (Substandard)," "Forced Use (Substandard)," "Sterile" or "Unusable."[6]
 
 
 15
 The officers here claim, and we accept for purposes of this appeal, that the real property records thus compiled classify 98.1% Of the buildings used as officers' quarters in Thailand as less than "adequate."[7] The completion of AF Form 1430 is required by an Air Force regulation, AFM 93-1, which requires the Air Force to maintain real property accountability records on all structures within each Air Force installation. These records contain information concerning the physical attributes of the structures including such items as gross dimensions and construction materials as well as various types of accounting data.[8]
 
 
 16
 During the period to which this action relates nothing in any regulation specified that the condition code used on Form 1430 was to determine the adequacy or inadequacy of the buildings described for purposes of BAQ. The words used are the same: both the statute and the real property records refer to adequacy. But their purposes are different; only semantic identity would lead to the conclusion that what is considered adequate physically in describing a building is also to determine whether quarters in the building are adequate and appropriate for purposes of the statute.
 
 
 17
 Prior to the time period relevant to this suit, AFM 30-7 contained a specific definition of "adequate" and "inadequate" quarters for BAQ purposes. The August 1, 1967 edition of the regulations required officers quarters to be "classified" as "Usable Class A" . . . and (to) . . . meet the minimum standards of adequacy for occupancy established in this manual." It also stated, "These quarters will be carried as Condition Code 1 (Usable Class A) on the real property records." For claims arising when that regulation was in effect, the Court of Claims held in Lischak v. United States, 202 Ct.Cl. 598 (1973), that the condition code on AF Form 1430 defined adequacy for BAQ purposes. The government does not criticize this result.
 
 
 18
 However, the Air Force subsequently cancelled the regulation that tied "adequacy" for BAQ purposes to the real property records and replaced it; the new regulation no longer refers in any way to AF Form 1430 or the condition code placed on it. See AFM 30-7 (Jan. 1, 1970); AFR 30-7 (May 12, 1975).
 
 
 19
 The inferential relationships by which the officers seek to establish a continuing tie between BAQ and AF Form 1430 are too gossamer to link them. Appendix A2 to AFM 30-7 and AFR 30-7 merely provides instruction for completing AF Form 515 "Bachelor Housing and Guest House Utilization/Occupancy Report" a form showing the utilization of available bachelor housing. Under those instructions each installation is to identify the number of housing spaces classified as condition code "1", "2" or "3". This appendix provides no reasonable basis to infer that the Secretary of the Air Force intended to make the condition codes of AF Form 1430 definitional for BAQ purposes.
 
 
 20
 Indeed, AF Form 515 itself makes it clear that the condition code is not intended to show the adequacy of quarters for purposes of claiming entitlement to BAQ. As the instructions for completing that form show, all quarters whose condition code is a "1" or "2" are to be grouped together under the heading of "usable" spaces. This lack of distinction between condition code "2" (substandard) housing and condition code "1" (adequate) housing make it apparent that, whatever significance the condition code may have in terms of engineering considerations or construction planning, it was not intended to serve as the criterion for distinguishing between adequate and inadequate housing for BAQ purposes.
 
 
 21
 But, the officers claim, even if the real estate records do not define adequacy, the space standards for the continental United States do, and these must be applied uniformly world-wide; the statute, they argue, does not permit geographic distinctions to be drawn in the regulations.
 
 
 22
 It is true that the grade, rank, or rating of each officer did not change when he was assigned to Thailand. However, the assignment patently changed his place of duty. It is not unreasonable to make a distinction between what is adequate (even in terms of space alone) for quarters in the tropics and what is suitable at the South Pole. It is no more unreasonable to take into account in considering adequacy not only the facts of climate but also the military, economic and social environment in the area where the officer is serving. The PACAF definition of 110 square feet (instead of 250 or 400 square feet) is not attacked because it is unreasonable, but merely because it is different. The discretion of the military to set different adequacy standards for housing for different areas and conditions was upheld in Lischak v. United States, 202 Ct.Cl. 598 (1973), the Court of Claims decision upon which the officers rely in attempting to establish the authority of AF Form 1430. Id. at 607.
 
 
 23
 Such geographic distinctions are not precluded by the doctrine of statutory construction, Expressio unius est exclusio alterius the expression of one excludes the other. Congress authorized the standards of adequacy to vary according to grade, rank, rating and number of dependents, but this did not imply an exclusion of all other criteria for determining what is adequate for a particular rank of officer.
 
 
 24
 Because the officers raise no other attack on the square foot standard, the issue of its validity was properly determined on motion for summary judgment. There were no material issues of fact to be resolved. The regulation drew a distinction within the power of the President or his delegates to make. Its validity need not depend upon the President's power as Commander-in-Chief or traditional judicial deference to military management of military affairs, See Gilligan v. Morgan, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). See also Warren, The Bill of Rights and the Military, 37 N.Y.U.L.Rev. 181 (1962).
 
 
 25
 However, for reasons set forth above, even the utmost deference to military judgment in armed forces affairs does not permit an air force commandant, or even the Chief Executive, to proclaim the arbitrary decision that anything the Air Force provides is by definition adequate.
 
 
 26
 For these reasons, we reverse as much of the judgment as dismisses the claims of the officers for BAQ after September 16, 1975. We affirm as much of the judgment as dismisses the claims of the officers who received 110 square feet of living space, exclusive of shared bathing and toilet facilities. To our mandate we add one caveat: the record does not permit us to determine and we express no opinion concerning whether any or all of the officers were in fact furnished adequate and appropriate quarters. That issue, like others, remains to be resolved in further proceedings consistent with this opinion.
 
 
 27
 REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 37 U.S.C. § 403 provides in part:
 (a) Except as otherwise provided by law, a member of a uniformed service who is entitled to basic pay is entitled to a basic allowance for quarters at the monthly rates prescribed in accordance with section 1009 of this title, according to the pay grade in which he is assigned or distributed for basic pay purposes.
 (b) Except as otherwise provided by law, a member of a uniformed service who is assigned to quarters of the United States or a housing facility under the jurisdiction of a uniformed service, appropriate to his grade, rank, or rating and adequate for himself, and his dependents, if with dependents, is not entitled to a basic allowance for quarters.
 (j) The President may prescribe regulations for the administration of this section, including definitions of the words "field duty" and "sea duty".
 The statute did not remain constant throughout the period of this suit. Until 1974, subsection (a) contained a table of BAQ payments. Also, prior to 1973, subsection (j) was designated subsection (g). None of these changes affect the issues here.
 
 
 [2]
 The principles involved in this suit are of obvious importance. In addition, the district court noted that the total claim amounted to approximately $20,000,000. Since no individual claim exceeds $10,000, jurisdiction was properly based on 28 U.S.C. § 1346(a)(2)
 
 
 [3]
 Any quarters or housing facilities under the jurisdiction of any of the uniformed services in fact occupied without payments of rental charges . . . (b) at his permanent station by a member without dependents . . . shall be deemed to have been assigned to such member as appropriate and adequate quarters, and no basic allowance for quarters shall accrue to such members under such circumstances
 Exec.Order No. 11,157 § 403, 29 Fed.Reg. 7973 (1964), Reprinted as amended in 37 U.S.C. § 301 note, at 647-652 (1977).
 
 
 [4]
 Prior to 1972 DoD Instruction 4165.47 did not contain the exception quoted but rather provided that its standards were applicable only at "such permanent overseas installations as may be designated by the Secretaries of the Military Departments." The officers make no claim that it applied to Thailand. The only relevant regulation applicable to Thailand before 1972 was therefore AFM 30-7, described below. Since AFM 30-7 is also applicable and controlling After 1972, the change in DoD Instruction 4165.47 is irrelevant to this appeal. See Lischak v. United States, 202 Ct.Cl. 598, 613 (1973)
 
 
 [5]
 Prior to 1974, AFM 30-7 defined adequacy in the same terms but absent the specification of a given number of square feet. In 1975 AFM 30-7 was superseded by AFR 30-7 containing the same terms as the version of AFM 30-7 issued on April 26, 1974. Neither of these changes is material to the issue at hand
 
 
 [6]
 Each AF Form 1430 contains a "1", "2", "3", "4", or "5" within the "condition" line and block space. The following definitions of "condition" apply to each "1", "2", "3", "4", or "5" found within a particular condition line and block space:
 
 
 [1]
 = Usable Class A (Adequate) Generally meets criteria. A facility which can be used to house the function for which currently designated through end position use with reasonable maintenance and without major alteration or reconstruction. Its functional adequacy, physical condition, structural adequacy, location, and adequate utility systems, i. e., heating, air conditioning, ventilation, power, etc., are the major elements of the determination. The use of this code does not prohibit project work. However, any construction project will indicate either a change in use, conversion or addition
 
 
 [2]
 = Usable Class B (Substandard) Upgrading required and practical. A facility which is structurally sound, and which is inherently capable of being raised to Usable Class A standards for housing function for which currently designated by reasonable and practical expenditure of funds; i. e., alteration, soundproofing, relocation, strengthening, fire protection deficiency correction, air conditioning, heating, or mechanical ventilation
 
 
 [3]
 = Force (sic) Use (Substandard) A facility that cannot practically be raised to meet Usable Class A standards for housing function for which currently designated, but which, because of necessity must be continued in use for a short duration, or until a suitable facility can be obtained. Its physical condition, location, lack of adequate utility systems or other overriding factors are such that the facility cannot be justifiably or economically improved and/or upgraded for that function. This definition is also applicable to a leased facility where the lease was entered into as the only means by which the required space could be provided. This excludes leases which are advantageous to the Air Force for reasons of short duration of requirement, location, economics, etc., which will be Code 1
 
 
 [4]
 = Sterile A facility which: (a) does not meet the condition classification Codes 1, 2, 3, or 5; (b) is excess to mission requirement in designed, changed, or converted use and is not, due to economic considerations, considered appropriate for disposal. The expenditure of maintenance funds on facilities in this classification is not authorized except for safety, health, and/or 'pickling' the facility. This code will apply to all facilities as they are vacated when the entire installation becomes excess of requirements
 
 
 [5]
 = Unusable A facility which is no longer tenable for any purpose. It assumes that unsatisfactory or unsafe conditions exist which render it unacceptable and useless for housing personnel, equipment, or supplies. This designation cannot be applied until the facility is vacated and when applied, requires disposal action within 120 days. Classification of airfield pavements as unusable must be approved by Hq USAF
 NOTES:
 
 
 [1]
 The Real Property Condition Codes 1, 2 and 3 are applied upon the capability of the real property facility to accommodate the function for which currently designated on the 1-HAF-Z17. Therefore, that code is no indication of the ability of the facility to accommodate a different function
 
 
 [2]
 Although structural condition must be considered in ascertaining code to be assigned, it is not the sole factor. Location of the facility, with reference to other facilities or to adverse environmental conditions (air, noises), functional layout, and condition of support facilities are equally important
 
 
 [3]
 Facilities which would be Code 1 will not be assigned Code 2 or 3 based only on inadequate size
 
 
 [4]
 The Data Element, 'Forced Use,' was formerly the Element, 'In Use.'
 AFM 300-4, Vol. IV (June 15, 1973).
 
 
 [7]
 According to the plaintiffs, 330 buildings (45.3%) were classified as "Usable Class B (Substandard)," 379 buildings (52.1%) were classified as "Forced Use (Substandard)" and 5 buildings (.7%) were classified as "Unusable." Only 14 buildings (1.9%) were classified as "Usable Class A (Adequate)."
 
 
 [8]
 AFM 93-1, the regulation providing authorization and instructions for the preparation of Form 1430, defines the purpose of the form. It states in part:
 3-2 Accounting Record Forms. AF Forms 1430 . .. constitute the formal real property accountable records. They have been designed to record all pertinent engineering and statistical data concerning Air Force real property. This information, with supporting maps, plans, specifications and real estate instruments provides the needed engineering data for day-to-day maintenance and operation requirements of the base civil engineer as well as for master planning and project and military construction program development. The recorded data is also the basis for the real estate facilities cost system and attendant budget for maintenance, repair, and operation of the facilities, and for reports required by all echelons of command such as the USAF Real Property Inventory Detail List required by AFM 87-18.