The FIRESTONE SYNTHETIC RUBBER & LATEX CO., a division of the Firestone Tire & Rubber Co., and Koppers Company, Inc., Intervenor,

v.

F. Ray MARSHALL, Secretary of Labor and Weldon J. Rougeau, Director, Office of Federal Contract Compliance Programs.

Civ. A. No. B–80–499–CA.

United States District Court,
E. D. Texas,
Beaumont Division.

Feb. 12, 1981.

Robert K. Lewis, Jr., Akron, Ohio, for Firestone Tire & Rubber Co.

David A. Copus, C. Daniel Karnes, Linda E. Rosenzweig, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D. C., James W. Hambright, Orgain, Bell & Tucker, Beaumont, Tex., for Firestone Synthetic Rubber & Latex Co.

Richard T. Sampson, Semmes, Bowen & Semmes, Baltimore, Md., Dewey J. Gonsoulin, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., for Intervenor Koppers Co., Inc.

Carin A. Clauss, James D. Henry, Louis G. Ferrand, A. Penny Dash, U. S. Dept. of Labor, Washington, D. C., Drew S. Days, III, John H. Hannah, Jr., David L. Rose, Katherine P. Ransel, U. S. Dept. of Justice, Washington, D. C., for F. Ray Marshall, et al.

## MEMORANDUM OPINION AND ORDER

JOE J. FISHER, District Judge.

Firestone Synthetic Rubber & Latex Co. (Firestone) brought this suit to review a final order of the Secretary of Labor (Secretary) which found Firestone in violation of Executive Order 11246, 30 Fed.Reg. 12319. The action was filed pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and the Administrative Procedure Act, 5 U.S.C. §§ 551–59 and 701–06. The Secretary's Order of July 13, 1980, terminates Firestone's present contracts and subcontracts with the government until Firestone adopts an affirmative action plan which is acceptable to the Office of Federal Contract Compliance Programs (OFCCP), under their implementing rules and regulations. Judge Parker granted a temporary restraining order and preliminary injunction preventing Firestone's debarment pending a decision on the merits. The Secretary filed the administrative record on August 4, 1980, and the case is presently before the Court on cross motions for summary judgment.

## I. THE FACTS

The OFCCP filed an administrative complaint against Firestone on February 22, 1980, alleging that the 1978 affirmative action plan for Firestone's Orange, Texas, facility (1) failed to declare underutilization in various job groups as required by Executive Order 11246 and 41 C.F.R. §§ 60–2.10 and 60–2.11; (2) failed to establish goals and timetables where appropriate; and (3) failed to include adequate action-oriented programs to correct identified problem areas in job groups and organizational units as required by 41 C.F.R. §§ 60–2.13, 2.23 and 2.24. *See* Decision and Final Order of the Secretary of Labor at 3–4 (Secretary's Decision).

The regulations direct the contractor to analyze its workforce to determine the utilization of women and minorities. "Underutilization" is defined "as having fewer minorities or women in a particular job group than would reasonably be expected by their availability." 41 C.F.R. § 60–2.11(b). It is this definition, or rather the Secretary's interpretation of it, that is the essence of this dispute. The Secretary contends that by virtue of Technical Guidance Memo No. 1 (TGM No. 1), underutilization exists whenever there is a numerical disparity between availability and utilization. Firestone contends that it need not declare underutilization whenever there is any numerical disparity; rather, Firestone has only declared underutilization when the difference between availability and utilization meets or exceeds the five percent level of statistical significance.[1]

---

1. This test of statistical significance has been used by Supreme Court in determining whether a plaintiff has established a prima facie case of discrimination in a pattern or practice employment discrimination case. *See, e. g., Hazelwood School District v. United States,* 433 U.S. 299, 311 n.17, 97 S.Ct. 2736, 2743 n.17, 53 L.Ed.2d 768 (1977).

Section 201 of Executive Order 11246 gives the Secretary power to issue regulations to implement the Order. Enforcement of the Order has been delegated to the Director of the OFFCP. 41 C.F.R. § 60–1.2. The affirmative action requirements of Executive Order 11246 are stated in 41 C.F.R. § 60–1.40. "Each contractor who has 50 or more employees and . . . has a contract of $50,000 or more . . . shall develop a written affirmative action compliance program for each of its establishments." To implement this requirement, the Secretary promulgated Revised Order No. 4, effective May 15, 1974, 39 Fed.Reg. 13264 (1974), codified at 41 C.F.R. §§ 60–2.1 to 60–2.32. Revised Order No. 4 "details the review procedure and the results of a contractor's failure to develop and maintain an affirmative action program and then sets forth detailed guidelines to be used by contractors in developing and judging these programs as well as the good faith effort required to transform the programs from paper commitments to equal employment opportunity." 41 C.F.R. § 60–2.1(a). Revised Order No. 4 requires the government contractor to conduct a two-step "utilization analysis." The contractor must first analyze its workforce by listing each job classification, indicating the number of employees by race and sex. 41 C.F.R. § 60–2.-11(a). Then, the contractor is directed to determine if women or minorities are underutilized in major job groups. 41 C.F.R.

§ 60–2.11(b). The regulations list eight factors the contractors must consider in determining whether women or minorities are underutilized.[2]

The consequence of declaring underutilization is that the contractor must develop "specific goals and timetables for the prompt and full achievement of equal opportunity." 41 C.F.R. §§ 60–1.40(a) and –2.12. Whether a contractor is in compliance with the Executive Order is not judged on whether it reaches its goals and meets its timetables. "Rather, each contractor's compliance posture shall be reviewed and determined by reviewing the contents of its program, extent of its adherence to this program, and its good faith efforts to make its program work toward the realization of the program's goals within the timetables set for completion." 41 C.F.R. § 60–2.14.

On February 22, 1974, the Secretary issued TGM No. 1 "which was intended to give specific guidance on the proper interpretation on certain selected issues regarding Revised Order No. 4." Defendants' Memorandum in Support of Motion for Summary Judgment (Defendants' Brief) at 5, quoting TGM No. 1. TGM No. 1 purports to interpret the definition of underutilization in 41 C.F.R. § 60–2.11(b). "The Director of OFCCP interprets that phrase to mean that underutilization exists whenever there is a numerical disparity between the

2. There are eight factors relating to women, and eight factors relating to minorities, as follows:

(1) [Underutilization of minorities] (i) The minority population of the labor area surrounding the facility; (ii) The size of the minority unemployment force in the labor area surrounding the facility; (iii) The percentage of the minority work force as compared with the total work force in the immediate labor area; (iv) The general availability of minorities having requisite skills in the immediate labor area; (v) The availability of minorities having requisite skills in an area in which the contractor can reasonably recruit; (vi) The availability of promotable and transferable minorities within the contractor's organization; (vii) The existence of training institutions capable of training persons in the requisite skills; and (viii) The degree of training which the contractor is reasonably

able to undertake as a means of making all job classes available to minorities.
(2) [Underutilization of women]
(i) The size of the female unemployment force in the labor area surrounding the facility; (ii) The percentage of the female workforce as compared with the total workforce in the immediate labor area; (iii) The general availability of women having requisite skills in an area in which the contractor can reasonably recruit; (iv) The availability of women seeking employment in the labor or recruitment area of the contractor; (vi) The availability of promotable and transferable female employees within the contractor's organization; (vii) The existence of training institutions capable of training persons in the requisite skills; and (viii) The degree of training which the contractor is reasonably able to undertake as a means of making all job classes available to women.

availability of minorities or women for a job group and the number of such persons employed in the job group." Defendant's Brief at 6 n.5.

It is not disputed that Firestone is and has been at all times a government contractor subject to Executive Order 11246 and the regulations issued thereto, including Revised Order No. 4. Accordingly, in 1978, Firestone submitted an affirmative action plan for its Orange, Texas, facility. No underutilization was declared and no goals and timetables established where the difference between availability and utilization did not exceed the five percent level of statistical significance. Resolution of the dispute by informal means was unsuccessfully attempted. The OFCCP filed an administrative complaint against Firestone and a hearing before an administrative law judge (ALJ) was held in May, 1980.[3] The ALJ issued his findings and conclusions on May 29, 1980, recommending that the complaint against Firestone be dismissed. The ALJ concluded that TGM No. 1 was not exempt from the notice and comment requirements of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551–59 and §§ 701–06, and hence could not be used by the OFCCP to prove that Firestone was in violation of Executive Order 11246. As to the other allegations in the administrative complaint, the ALJ stated: "[w]hether Defendant's AAPs [affirmative action programs] otherwise complied with the provisions of Section 60–2.11(b) has not been fully developed." He further stated "there can be little doubt that any other deficiencies in the AAPs in question, even if proved, would not warrant the injunctive relief and/or impositions of

the drastic sanctions sought in this proceeding." ALJ Decision at 10. The ALJ also found that the OFCCP considered the major job groups to be those with 50 or more employees. *Id.* at 6.

On July 13, 1980, the Secretary of Labor issued his Decision and Final Order reversing the ALJ, concluding that "the regulation itself requires the procedure described by TGM No. 1. Therefore, the definition in TGM No. 1 is not a legislative rule, but an interpretive statement." Secretary's Decision at 9. The Secretary also concluded that "major job groups" were not limited to those with 50 or more employees; rather all groups listed in 41 C.F.R. § 60–2.11 were considered major regardless of size. All other job groups were to be judged by their size and other important attributes. Secretary's Decision at 11–13. Thirdly, the Secretary found that Firestone's failure to adopt an affirmative action plan with specific action-oriented programs to eliminate deficiencies in organizational units, as opposed to job groups, was an independent violation justifying the sanction of debarment. *Id.* at 14–15, 38.

## II. SCOPE OF REVIEW

The standards of review of the Decision and Final Order of the Secretary are established by the APA § 706. The Secretary's decision should be reversed if it is:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

---

**3.** When a compliance review indicates the existence of a possible violation of the Executive Order or regulations, 41 C.F.R. §§ 60–1.24(c)(2) and 60–1.26(a)(2) state that the matter is to be resolved by informal means, if possible. The contractor could comply with the Director of the OFCCP and then file a request for a hearing and subsequent judicial review. *Id.* § 60–1.-24(b)(4). If the contractor refuses to comply, the Director may commence enforcement proceedings against it to impose sanctions, including termination, suspension of contracts and debarment. *Id.* § 60–1.26(a). No order of debarment shall issue, however, without the opportunity for a hearing before an ALJ, with

right to counsel, to present evidence, and to cross-examine witnesses. *Id.,* § 60–30 et seq. Pre-hearing discovery is permitted. *Id.*

Recent amendments to the Regulations provide for expedited hearing procedures. *See* 44 Fed.Reg. 77000, 41 C.F.R. § 60–30.31. Those procedures were invoked in this case.

After the hearing, the ALJ must make recommended findings and conclusions. *Id.* § 60.30.-27. The parties may submit objections before the Secretary issues his final administrative order. *Id.* § 60–30.28. The APA § 704 provides for judicial review of final decisions imposing sanctions.

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence. . . .

*Id.*

Both parties have moved for Summary Judgment on the basis that there are no genuine issues as to any material facts and that they are entitled to judgment as a matter of law. A voluminous administrative record was filed and considered by the Court, as well as memoranda filed by plaintiffs, defendants, amici and intervenor.[4]

## III. CONTENTIONS OF THE PARTIES

### A. Contentions of the Secretary

The Secretary's contentions are: first, TGM No. 1 is no more than an interpretation of 41 C.F.R. § 60–2.11(b) and is therefore exempt from the notice and comment requirements of the APA. Second, this interpretation is a reasonable one, and should be given deference by the Court. Third, the Secretary's definition of major job groups is a reasonable interpretation of the regulations at 41 C.F.R. § 60–2.11 and should be given deference. Fourth, Firestone failed to comply with the affirmative action requirements relating to analysis of the work force by organizational unit.

### B. Contentions of Firestone

Firestone argues that: (1) The affirmative action requirements of TGM No. 1 were issued in violation of the notice and comment requirements of the APA; (2) The affirmative action requirements imposed by TGM No. 1 are unreasonable; (3) The affirmative action requirements imposed by 41 C.F.R. § 60–2.11(b) and TGM No. 1 are unconstitutional in that they violate the fifth amendment by requiring race and sex discrimination; (4) The affirmative action requirements violate Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq.; (5) The affirmative action requirements violate Executive Order 11246; (6) Firestone fully complied with the affirmative action relating to organizational units; (7) TGM No. 1 is so vague that its application is unlawful under federal procurement law; and (8) The sanction of debarment is not warranted in this case.

## IV. DISCUSSION

### A. Compliance with the Administrative Procedure Act

It is argued that the Secretary, to make TGM No. 1 effective and binding on federal contractors and the courts, must submit the proposed rule for publication in the Federal Register and give the interested parties an opportunity to comment on the proposed rule. 5 U.S.C. § 553(b), (c), and (d). It is undisputed that the defendants did not comply with section 553.

The Secretary argues that TGM No. 1 is exempt from the notice and comment requirements because is it an "interpretive" rule. *See* 5 U.S.C. § 553(b)(3)(A).

It is no easy task to determine whether a rule[5] is "legislative" or interpretive. At the outset, it should be noted that the Secretary has been delegated the power to issue both legislative and interpretive rules. Executive Order 11246, § 201. Also, the Secretary says, at least for the purposes of this case, that it intends the rule to be interpretive.

In deciding whether a rule is interpretive, "[t]he crucial question is whether the agency intends to exercise delegated power to make rules having force and effect of law, and the intent usually can best be found in what the agency says at the time of issuing the rules." K. Davis, *Administrative Law in the Seventies*, § 5.03 at 148 (1976).

In *Brown Express, Inc. v. United States*, 607 F.2d 695 (5th Cir. 1979), the Fifth Circuit adopted the distinction as follows:

---

**4.** Amicus curiae briefs in support of the defendants' motion for summary judgment were filed by the Washington Legal Foundation and the Equal Employment Advisory Counsel.

Koppers Company, Inc., was granted leave to intervene for the limited purpose of filing briefs and presenting oral argument.

**5.** There is no question that TGM No. 1 is a rule within the meaning of 5 U.S.C. § 551(4).

" '[g]enerally speaking, it seems to be established that "regulations," "substantive rules" or "legislative rules" are those which create law, usually implementary to an existing law; whereas interpretive rules are statements as to what the administrative officer thinks the statute or regulation means.' " *Id.* at 700 (quoting *Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C.Cir. 1952)).

In *Brown Express* the ICC issued a "Notice of Elimination of Notification Procedure" without complying with the notice and comment requirements of the APA. The Fifth Circuit rejected the ICC's claim that the notice was an interpretive rule, because the notice "effect[ed] a change in the method used by the Commission in granting substantive rights. As such, it is a new rule and cannot be interpretive." *Brown Express,* 607 F.2d at 700.[6]

In *Chamber of Commerce of United States v. OSHA,* 636 F.2d 464 (D.C.Cir. 1980), the District of Columbia Circuit held that an OSHA rule requiring employers to pay employers for "walkaround" time was not interpretive. *Id.* at 467. The court stated: "[b]ecause the Administration possesses legislatively delegated power to make legislative rules and because it is apparent to us that the administration must have intended this regulation to be an exercise of that power, we hold that the walkaround pay regulation is a legislative rule." *Id.* at 468. Further, "the Administration has attempted through this regulation to supplement the Act, not simply construe it, and therefore the regulation must be treated as a legislative rule." *Id.* at 469. "And, although it serves as an interpretation of existing law, it also effectively enunciates a new requirement heretofore nonexistent for compliance with the law." *Id.* at 471.

Similarly, in *Batterton v. Marshall,* No. 78–1414 (D.C.Cir. August 28, 1980), the D.C. Circuit held that the Department of Labor violated the APA when it employed a new procedure for determining unemployment statistics. The adoption of the new methodology was "not merely an interpretation of statutory language because it actually prescribes the regulatory structure through which the critical variable in the CETA formula is attained." *Id.* slip op. at 24.

■ It is clear to this Court that although TGM No. 1 purports to interpret the phrase "fewer than would reasonably be expected by their availability," it creates a new obligation for federal contractors. There is no doubt that under the Secretary's Decision contractors *must* declare underutilization whenever the number of incumbent minorities or women is less, by at least one or more person, than the number available, which obligation did not exist before TGM No. 1 was issued. As such, the Court cannot fail to conclude that the Secretary intended to exercise its delegated power to make a rule having the force of law. *See Joseph v. Civil Service Commission,* 554 F.2d 1140 (D.C.Cir.1977); *American Bancorporation v. Board of Governors of the Federal Reserve System,* 509 F.2d 29, 33–35 (8th Cir. 1974). "[T]he intent usually can best be found in what the agency says at the time of issuing the rules. A statement by the agency's counsel in later litigation may have much less effect or no effect." *Davis, supra,* § 5.03 at 148.

Even if TGM No. 1 is "interpretive," and the Court holds that it is not, notice and opportunity for comment would be required in any event because the interpretation has a "substantial impact" on those regulated. *See Brown Express, supra,* at 702. " '[W]hen a proposed regulation of general applicability has a substantial impact on the regulated industry or an important class of the members or product of that industry, notice and opportunity for comment should first be provided.' " *Id.,* quoting *Pharmaceutical Manufacturers Association v. Finch,* 307 F.Supp. 858, 863 (D.Del.1970).[7]

---

6. The *Brown Express* panel also stated that the notice was not interpretive because it did not purport to interpret a statute or regulation, and defined no ambiguous term. TGM No. 1, on the other hand, does purport to interpret the definition of "underutilization," making the number that would reasonably be expected equal to the number available.

7. The *Brown Express* panel used the substantial impact test to determine whether the ICC notice was within the exception for procedural

*See Batterton v. Marshall*, No. 78–1414 slip op. at 27–31 & n. 83 (D.C.Cir. August 28, 1980); *Joseph v. Civil Service Comm'n*, 554 F.2d 1140, 1154 (D.C.Cir.1977); *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975); *Pickus v. United States Board of Parole*, 507 F.2d 1107, 1112 (D.C.Cir.1974); *Detroit Edison v. EPA*, 496 F.2d 244, 249 (6th Cir. 1974); *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478 (2d Cir. 1972); *National Motor Freight v. United States*, 268 F.Supp. 90 (D.D.C.) (three judge court), *aff'd*, 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968). *See generally* K. Davis, *Administrative Law in the Seventies*, §§ 5.03–1 to 5.03–3 (1976).

There is no doubt that TGM No. 1 has a substantial impact on government contractors, and thus fairness requires that the notice and comment procedures apply. *See Davis, supra*, at § 6.01–7 to 6.01–8.

B. Deference to the Secretary's Interpretation

◼ As a separate and independent ground for vacating the Decision of the Secretary, the Court finds that even if the Secretary prevailed in his argument that TGM No. 1 is interpretive, his interpretation is unreasonable, inconsistent with the regulation it interprets and past agency practice and thus is entitled to no weight by the Court.

◼ The foundation case on the weight to be accorded administrative interpretations is *Skidmore v. Swift*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), where the Court stated:

We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which the courts and litigants may properly resort for guidance. The weight of such judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements,

and all those factors which give it power to persuade, if lacking power to control. *Id.* at 140, 65 S.Ct. at 164. While it is true that the courts normally defer to an agency's interpretation of a statute or regulation, *see Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964); *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945), "a court is not required to give effect to an interpretive regulation." *Batterton v. Francis*, 432 U.S. 416, 425 n.9, 97 S.Ct. 2399, 2405 n.9, 53 L.Ed.2d 448 (1977). *See General Electric Co. v. Gilbert*, 429 U.S. 125, 142–43, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976); *United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). "Courts will give extra authoritative weight to interpretive rules (as well as other interpretations) which are made contemporaneously with the enactment of the statute, which have been followed consistently over a long period, or which were outstanding at the time of statutory reenactment." 2 K. Davis, *Administrative Law Treatise*, § 7:14 at 64. (1979).

It is apparent from the record that TGM No. 1 was not issued contemporaneously with the definition of underutilization, has not been consistently applied, and does not represent a longstanding interpretation of the regulation. Furthermore, TGM No. 1 belies the plain meaning of 41 C.F.R. § 60–2.11(b).

Addressing the latter point first, it is clear that the words "less women or minorities than would reasonably be expected by their availability" creates a subjective standard by which underutilization is to be determined. The Secretary's interpretation, on the other hand, creates an objective standard leaving no room for discretion. The Fifth Circuit has recently stated, in reviewing an executive order defining "appropriate and adequate" quarters for servicemen, that "[t]he power to make regulations defining what is adequate and appropriate is not a delegation of authority to wipe out the statute by imposing an Orwel-

---

rules. The *Pharmaceutical Manufacturers' Association* case, however, quoted by the Fifth

Circuit, does not limit the substantial impact test to procedural rules.

lian definition that adopts no standard at all. Regulations must be consistent with the statutory authority that alone gives them validity." *Day v. United States*, 611 F.2d 1122, 1124 (5th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980).

Furthermore, the regulation itself provides that eight factors are to be considered in determining whether underutilization should be declared.[8] As 41 C.F.R. 60–2.-11(b) does have the force and effect of law, the Secretary must consider these factors in determining whether underutilization should be declared. The Secretary argues that these factors are considered in determining availability, and that once availability is determined, whether underutilization exists is a mere mathmatical computation. The Court does not agree. Section 2.11(b) requires the listed factors to be considered in determining underutilization, and estimating availability is only part of the analysis.

The cases cited by the defendant for the proposition that agency interpretations should control, *see Udall v. Tallman, supra* and *Bowles v. Seminole Rock Co., supra,* are easily distinguished. In *Udall*, Public Land Order No. 487 provided that certain public lands "are hereby temporarily withdrawn from settlement, location, sale or entry . . . ." 380 U.S. at 5, 85 S.Ct. at 795. The Court held that it was reasonable for the Secretary of the Interior to say that the Order did not preclude him from granting oil leases. *Id.* at 4, 85 S.Ct. at 795. The interpretation there was consistent and a matter of public record. *Id.* Similarly, in *Bowles v. Seminole Rock Co.,* the Wage and Price Administrator construed the "highest price . . . charged . . . for delivery . . . during March 1942" to mean the highest price charged anytime for delivery in

March, 1942. 325 U.S. at 413–14, 65 S.Ct. at 1217. The Court upheld that interpretation, as it was not plainly erroneous or inconsistent with the regulation. In the instant case, however, the interpretation is not consistent with the regulation.

The Court agrees with Firestone's contentions, well supported in the record, that TGM No. 1 is not a longstanding interpretation of 41 C.F.R. § 60–2.11(b). It appears that the first time the OFCCP applied TGM No. 1 was at Firestone's Orange Facility.[9]

■ An administrative interpretation should be given extra weight if it was adopted contemporaneously with the regulation being interpreted. The definition of underutilization contained in 41 C.F.R. § 60–2.11(b) was adopted on February 5, 1970, 35 Fed.Regs. 2586, 2587 (1970). TGM No. 1 was issued eight days after Revised Order No. 4 was issued in 1974. Revised Order No. 4 amended 41 C.F.R. § 60–2.10, but did not alter the definition of underutilization or the factors that determine it.

"In short, while we do not wholly discount the weight to be given [TGM No. 1], it does not receive high marks when judged by the standards in *Skidmore, supra.*" *General Electric Co. v. Gilbert*, 429 U.S. 125, 143, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976). Thus, even if TGM No. 1 were exempt from the APA notice and comment requirements, the Court would give it no weight and vacate the Decision of the Secretary.[10]

## C. Major Job Groups

As a secondary argument, related to the failure to declare underutilization, the government claims that Firestone did not conduct a utilization analysis in all major job groups. The phrase major job groups is not defined in the regulations. While not

---

**8.** *See* note 2, *supra.*

**9.** In fact, in *Legal Aid Society of Alameda County v. Brennan*, 608 F.2d 1319 (9th Cir. 1979), *cert. denied*, 444 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980), several black residents of California and organizations representing them sued the Department of Labor for its repeated approval of affirmative action plans that were not in compliance with Revised

Order No. 4, including TGM No. 1. The Ninth Circuit held that the "officials repeatedly approved affirmative action programs that failed to satisfy the fundamental requirements of Revised Order No. 4." *Id.* at 1338.

**10.** *But see Legal Aid Society of Alameda County v. Brennan*, 608 F.2d 1319, 1341 n.43 (9th Cir. 1979), *cert. denied*, 444 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980).

expressly ruling on the subject, the ALJ did find that "[m]ajor job groups are considered by [the OFCCP] to be those that contain more than 50 persons." ALJ Decision at 6 (finding No. 24).

The Court agrees with the ALJ that the government's contentions regarding major job groups and organizational units do not independently support Firestone's debarment. The dispute is essentially over the validity and effect of TGM No. 1. Nonetheless, the Court will address the arguments that have been presented.

The Secretary concluded that major job groups included six groups enumerated in section 2.11 as requiring special attention,[11] regardless of size. In addition, he said "[o]ther job groups may be characterized as major because of their numerical significance or other important attributes." Secretary's Decision at 12.

The list of six groups requiring special attention does not purport to define or interpret "major job groups." An examination of the record leads to the conclusion that the OFCCP regularly interpreted "major" as meaning "containing more than 50 employees." The compliance manual recommends groupings with 50 or more employees to permit meaningful analysis, and no where did the OFCCP or the Secretary complain about Firestone's groupings.

■ If the Secretary's interpretation of "major job groups" is to be binding, it must be promulgated pursuant to the notice and comment requirements of the APA. As an interpretive rule, the Court declines to give it any weight. *See* part IV(B), *supra.* The Court does not hold that "major job groups" are those with 50 or more employees, only that Firestone's failure to declare underutilization in job groups cannot be a basis for debarment absent a determination

by the Secretary that the groups are major, consistent with this opinion.

### D.  Organizational Units

■ Firestone is charged with failure to identify problem areas by organizational unit and job group, and failure to develop an action oriented program to correct those deficiencies. The Court feels that this charge is nothing more than a make-weight and does not independently support Firestone's debarment.

Section 60–2.13(d) requires "[i]dentification of problem areas by organizational units and job group." Subpart C of Section 60 then lists the "Methods of Implementing the Requirements of Subpart B." Section 60–2.23 is entitled "Identification of problem areas by organizational units and job groups" and requires "an in-depth analysis" of eight areas. Special corrective action must be taken if any of 19 deficiencies are found. As best the Court can determine, the Secretary charges Firestone with failing to correct a deficiency listed in section 60–2.23(a)(1) and (b)(1). These sections require the contractor to analyze the composition of its workforce by organizational unit and job group with regard to women and minorities, and take special corrective action if an underutilization is found in job groups. The Secretary admits that Firestone is not required to perform an utilization analysis by organizational unit. Secretary's Decision at 32. Furthermore, to the extent that Firestone must take special corrective action to remedy underutilization by job group, these requirements repeat those in section 2–11(b), and the analysis in parts IV, A and B of this opinion applies.

Much is made of the fact that Firestone did perform some kind of utilization analysis by organizational unit, even though it

---

11.  Section 60–2.11 states, in part:

Based upon the Government's experience with compliance reviews under the Executive Order program and the contractor reporter system, minority groups are most likely to be underutilized in departments and jobs within departments that fall within the following . . . designations: Officials and managers, professionals, technicians, sales workers, of-

fice and clerical and craftsmen (skilled). [W]omen are likely to be underutilized in departments and jobs within departments as follows: Officials and managers, professionals, technicians, sales workers . . . , craftsmen (skilled and semi-skilled). Therefore, the contractor shall direct special attention to such jobs in its analysis and goal setting for minorities and women.

was not required to. The government argues that Firestone should be forced to correct underutilization thus found.

All the requirements for affirmative action programs relating to organizational units set out in § 60, Subparts B & C. Section 2.23 defines the requirements of section 2.13 and limits the contractor's duty to analyze and correct deficiencies by organizational unit. The only possible basis for a violation here is that Firestone failed to correct underutilization by job group. None of the other 18 items listed in 2.23(b) were alleged or found. Thus, the Secretary's conclusion that Firestone violated Executive Order 11246 is not supported by substantial evidence.

## V. CONCLUSION

The Court need not rule on Firestone's other contentions regarding, among other things, the constitutionality of TGM No. 1, because of today's holding that the Secretary failed to comply with the APA.

TGM No. 1 is hereby vacated for failure to comply with 5 U.S.C. § 553, and the cause remanded to the Secretary for further proceedings consistent with this opinion.