BROWN EXPRESS, INC., et
al., Petitioners,

v.

The UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

ALAMO EXPRESS, INC., et
al., Petitioners,

v.

The UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

COMMON CARRIER CONFERENCE—
IRREGULAR ROUTE, Petitioner,

v.

The UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

Nos. 79–1457, 79–1458 and 79–1926.

United States Court of Appeals,
Fifth Circuit.

Nov. 30, 1979.

Robinson, Felts, Meyers, Starnes & Latting, Phillip Robinson, Timothy Mashburn, Austin, Tex., for Brown Exp., Inc., et al.

Joseph H. Hart, Austin, Tex., for Brown Exp., Inc., et al. and for petitioner in No. 79–1926.

Harry J. Jordan, Washington, D. C., for Brown Exp., Inc., et al. and for Alamo Exp., Inc.

H. Glenn Scammel, Washington, D. C., for respondents in all cases.

Clark, Thomas, Winters & Shaprio, Jerry C. Prestridge, Austin, Tex., for Merchants Fast Motor Lines, Inc.

Jones, Mays & Capps, Houston, Tex., for Alamo Exp., Inc.

Ewell H. Muse, Jr., Austin, Tex., for Southwestern Motor Transport, Inc.

Margaret O. Halpern, Atty., U. S. Dept. of Justice, Washington, D. C., for respondents in Nos. 79–1458 and 79–1926.

John Elliott Bunce, Arlington, Va., for Ryder Truck Lines.

John J. Powers, III, Atty., Dept. of Justice, Washington, D. C., for respondents in 79–1926.

Before WISDOM, CHARLES CLARK, and GEE, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Section 10928 of the Interstate Commerce Act, 49 U.S.C. § 10928, authorizes the Interstate Commerce Commission to "grant a motor carrier or water carrier temporary authority to provide transportation to a place or in an area having, respectively, no motor carrier or water carrier capable of meeting the immediate needs of the place or area. Unless suspended or revoked, the Commission may grant the temporary authority for not more than 180 days." If the ICC grants the temporary authority [TA] and if the applicant files an application for corresponding permanent authority as provided by Title 49, it can continue to operate until the permanent authority application is finally decided. 49 C.F.R. § 1101.1 (1978).

The Commission also grants emergency temporary authority [ETA] for periods of 30 days or less "to meet an immediate and urgent need for service due to emergencies, in which time or circumstances do not reasonably permit the filing and processing of an application for temporary authority." 49 C.F.R. § 1131.1(b)(1) (1978). If an applicant for ETA certifies that within 15 days of the date of filing his application for ETA it will file a corresponding application for 180-day temporary authority, the Commission will as a matter of course grant two successive 30-day extensions of emergency temporary authority. 49 C.F.R. § 1131.2 n.2.A (1978).

Notice of the filing of applications for 180-day temporary authority is published in the *Federal Register.* Any interested person who can and will provide all or part of

the proposed service may file a protest against the application within 15 days. 49 C.F.R. § 1131.3(a) (1978). Applications for emergency temporary authority are not published in the *Federal Register, id.*, but it has been the practice of the Commission for over 40 years to communicate by telephone with existing carriers who hold permits to serve the ETA area to determine whether there is truly an immediate and urgent need for the additional service. Existing carriers are not otherwise notified of the filing of competing service ETA applications.

On December 15, 1978, however, the Commission published in the *Federal Register* its *Notice of Elimination of Notification Procedure in the Processing of Emergency Temporary Authority Applications under 49 U.S.C. 10928*, 43 Fed.Reg. 58701 (Dec. 15, 1978) ["Notice of Elimination"]. The Notice of Elimination provided in part: "The Commission has determined that it is no longer necessary for its field staff to notify competing carriers and other interested parties when a motor carrier files an application for an Emergency Temporary Authority (ETA)." The notice also stated that the Commission had determined that discontinuing the practice of ETA notification "would have little adverse effect, if any, on applicants, competing carriers, or supporting shippers," because ETAs are limited to 30 days in duration, because applicants must show an immediate need for the proposed service, and because supporting shipper statements must be made under oath. The notice further provided that an adversely affected carrier may appeal the grant of ETA within 15 days after becoming aware of the grant.

The change was to become effective on December 30, 1978, 15 days after publication in the *Federal Register*, without an opportunity for comment by interested persons and with less than the thirty days'

notice required by the Administrative Procedure Act, 5 U.S.C. § 553(c) & (d). The Commission relied upon the exemption in § 553(b) in holding that the Act did not apply to this change. It stated:

> This change constitutes a general statement of Commission policy that will have little, if any, substantive or binding impact on interested parties. Therefore, for good cause, notice and public comment are unnecessary since the technical change in practice is not major and it will have little adverse effect.[1]

On December 29, 1978, the Common Carrier Conference—Irregular Route filed a petition with the Commission requesting a stay of the proposed rule change, further administrative review, and the institution of a rule-making proceeding under the Administrative Procedure Act. The Commission did not act upon the petition until February 1, 1979, when it returned the petition to the Conference, stating that no petition for administrative review could lie because no decision was rendered. In the meantime, on January 26, 1979, the Conference had filed a petition for review of the Notice of Elimination in the United States Court of Appeals.[2]

In January and February of 1979, the ICC's Motor Carrier Board granted emergency temporary authority to motor carriers Texas-Oklahoma Express, Inc., and Ryder Truck Lines Co., Inc. Under the new policies set out in the Notice of Elimination, Brown Express, Inc., and Alamo Express, Inc., who were competing carriers, were not notified of the ETA applications. When they learned of the grants of ETA, they petitioned this court for review and applied for a stay pending our disposition of their petition. On March 27, 1979, we granted that stay. Petitioners also sought administrative review by the ICC of the Board's action. On April 17, 1979, Vice Chairman Brown revoked the grants of ETA to both

---

1. Commissioner Clapp dissented from the Commission's action, believing that because of the substantive effect of the change, the Administrative Procedure Act required notice and comment.

2. That petition was originally filed in the United States Court of Appeals for the District of Columbia Circuit. On motion for the petitioner, it was transferred to this court on April 16, 1979, and assigned the docket number 79–1926.

Texas-Oklahoma Express, Inc., and Ryder Truck Lines Co., Inc. We therefore dismissed both appeals as moot insofar as they sought review of those grants. These appeals were consolidated with the petition of Common Carrier Conference—Irregular Route for determination whether the Notice of Elimination was validly promulgated and was, on its merits, proper.

I

We first consider whether the issue as to proper promulgation is justiciable after the Commission's revocation of the present ETAs, and find that the issue is not moot and that the parties have standing. Petitioners challenge not only the method of effecting the change in procedure by adopting the Notice of Elimination but also the merits of the new procedure. Because we hold that the Notice of Elimination was not promulgated in accordance with the notice and comment requirements of the Administrative Procedure Act, we do not reach the issue of the merits of the procedure itself, so we need not consider to what extent the latter issue is moot.

■ Although we do not pass on the merits of the Notice of Elimination procedure, it is still in use. Thus, a challenge under the Administrative Procedure Act to the manner in which this currently used procedure was adopted is not moot. The parties who make this challenge have standing. Petitioners Brown and Alamo have demonstrated that they suffered injury in fact because the Notice of Elimination procedures were applied to them. That it allowed their competitors an advantage, albeit temporary, is enough, since the Interstate Commerce Act provides that its purposes include the encouragement of "sound economic conditions among carriers" and the avoidance of "unreasonable discrimination or unfair or destructive competitive

practices." 49 U.S.C. § 10101(a)(3) & (4). *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Petitioner Common Carrier Conference—Irregular Route represents over 400 regulated motor carriers, whose interests as well as those of their competitors have been affected by this agency action. These carriers are all arguably within the protected class. Accordingly, the Conference, as their collective representative, also has standing.

II

■ The Notice of Elimination is a "rule" and its promulgation constituted "rule making" within the meaning of the Administrative Procedure Act.[3] Section 553 of the Act provides that an agency must provide notice of a proposed rule making in the *Federal Register* and afford an opportunity for interested persons to present their views. 5 U.S.C. § 553(b) & (c). The required publication must be made not less than 30 days before the effective date of the proposed rule. 5 U.S.C. § 553(d). In promulgating the Notice of Elimination, the Commission did not attempt to comport with these requirements. It argues that the requirements of section 553 do not apply to the Notice of Elimination.

A. *Exemption Under the Interstate Commerce Act*

■ The Commission first urges that 49 U.S.C. § 10928 exempts the Notice of Elimination from the notice and comment requirements of the Act. This argument is frivolous. Section 10928 authorizes the Commission to make specific grants of emergency temporary authority without regard to the Act's notice and comment requirements. It in no way addresses how the Commission shall make rules regarding its procedure for granting ETAs. Nor does

---

**3.** 5 U.S.C. § 551(4) defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes [various substantive agency functions] or prac-

tices bearing on any of the foregoing." 5 U.S.C. § 551(5) defines "rule making" as "agency process for formulating, amending, or repealing a rule." Indeed, the ICC does not argue that its action was not rule making but only that the Notice of Elimination was exempt from the Act's notice and comment provisions.

it follow that simply because emergency temporary authority may itself be granted without notice and comment that the procedures for granting ETAs may be altered or amended without the notice and comment opportunity required by the Act. Those procedures may implicate rights different from those affected by any specific grant of ETA. Section 10928 therefore does not affect our inquiry.

## B. *Exemption Under the Administrative Procedure Act*

■ The Administrative Procedure Act exempts "interpretative rules, general statements of policy, [and] rules of agency organization, procedure, or practice" from the notice and comment requirements. 5 U.S.C. § 553(b)(A). In the Notice of Elimination itself, the Commission attempted to avoid the notice and comment requirements of the APA by characterizing its action as a "procedural change" and "a general statement of Commission policy." The court, however, must determine the category into which the rule falls. "[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 481 (2d Cir. 1972).

### 1. *Interpretative Rules*

■ The Commission argues that because it has never had a formal regulation requiring that notice of ETA applications be given to competing carriers, the Notice of Elimination merely announced the approach the Commission would take in interpreting the existing ETA regulations. It is therefore a "clarification or explanation of existing laws of regulations rather than a substantive modification [of existing regulations] or adoption of new regulations," (cit-

ing *Continental Oil Co. v. Burns*, 317 F.Supp. 194, 197 (D.Del.1970)). Consequently, the Commission concludes, the Notice is exempt from the notice and comment requirements as an "interpretative rule."

Although the APA exempts "interpretative rules," it nowhere defines that term. The Justice Department defines interpretative rules as "rules or statements issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers."[4] U. S. Department of Justice, Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947) [hereinafter cited as Attorney General's Manual]. Perhaps the most often cited definition of interpretative rules is that provided by the District of Columbia Circuit: "Generally speaking, it seems to be established that 'regulations,' 'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretative rules are statements as to what the administrative officer thinks the statute or regulation means." *Gibson Wine Co. v. Snyder*, 90 U.S.App.D.C. 135, 194 F.2d 329, 331 (D.C.Cir.1952).

The Commission's Notice of Elimination is not an interpretative rule, for it does not purport to interpret a statute or regulation. Notwithstanding the Commission's assertion that the Notice of Elimination merely announced the approach the Commission would take in interpreting and applying 49 U.S.C. § 10928 and the existing ETA regulations, the Notice of Elimination is not a mere clarification. It defines no ambiguous term. It gives no officer's opinion about the meaning of the statute or regulations. Rather, it effects a change in the method used by the Commission in granting substantive rights. As such, it is a new rule and cannot be interpretative. *Cf. Standard Oil Co. v. Department of Energy*, 596 F.2d 1029, 1061 (Temp.Emer.Ct.App.1978).[5]

---

4. The courts have given deference to the interpretations of the Attorney General's Manual "because of the role played by the Department of Justice in drafting the legislation." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 546, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978).

5. Our refusal to classify the Notice of Elimination as interpretative within the meaning of § 553's exemption is not intended to signify that it should be treated as a legislative rule. *Cf.* K. Davis, Administrative Law of the Seventies 147 (1976). Indeed, it is not legislative. The ICC clearly had no intention to use

### 2. General Statements of Policy

 The Commission also contends that the Notice of Elimination may be characterized as a "general statement of Commission policy." The term "general statements of policy," like "interpretative rules," is not defined in the Act. The Attorney General's Manual defines general statements of policy as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." Attorney General's Manual at 30 n.3. A general statement of policy is a statement by an administrative agency announcing motivating factors the agency will consider, or tentative goals toward which it will aim, in determining the resolution of a *substantive* question of regulation.

> A general statement of policy . . . is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

*Pacific Gas & Electric Co. v. FPC*, 164 U.S. App.D.C. 371, 376, 506 F.2d 33, 38 (D.C.Cir. 1974). However, the Notice of Elimination does none of these things. It does not tell what guidelines will be used in making future awards of ETA. The Commission asserts that the policy guiding the award of ETA will remain unchanged. Nor does it set a goal that future proceedings *may* achieve, for the change has been presented as a *fait accompli*. Immediately upon its effective date, the former practice of giving notice was no longer to be followed. An announcement stating a change in the method by which an agency will grant substantive rights is not a "general statement of policy." Thus, the Notice of Elimination is not exempt from APA requirements as a "general statement of policy."

statutorily delegated power. Rather, it simply wished to amend one part of its method of handling applications for emergency temporary

### 3. Procedural Rules

 Section 4(A) of the Administrative Procedure Act, 5 U.S.C. § 553(b)(A), also exempts "rules of agency organization, procedure, or practice." At first blush, the Notice of Elimination would appear to fall squarely within this exemption, for the change affected by the Notice clearly relates to the internal practices of the Commission. But the mere fact that it may guide Commission procedures does not mean that the Notice is a "procedural" rule for purposes of the Administrative Procedure Act.

"Procedure" and its opposite, "substance," are not talismanic labels or given premises. Rather, they are legal conclusions which depend upon their settings for definition. Whether something is substantive or procedural hinges on the policies underlying the act to which they relate.

 The Supreme Court has stated that the notice and comment provisions "were designed to assure fairness and mature consideration of rules of general application." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764, 89 S.Ct. 1426, 1429, 22 L.Ed.2d 709 (1969). These provisions afford an opportunity for "the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." *Texaco, Inc. v. FPC*, 412 F.2d 740, 744 (3rd Cir. 1969). Congress realized that an agency's judgment would be only as good as the information upon which it drew. It prescribed these procedures to ensure that the broadest base of information would be provided to the agency by those most interested— and perhaps best informed—on the subject of the rulemaking at hand. *See Shell Oil v. FEA*, 574 F.2d 512, 516 (Temp.Emer.Ct. App.1978).

 The proper test to be applied in considering a rule that may arguably fall under the exemptions for "procedural rules" is as stated by *Pharmaceutical Manu-*

authority. For purposes of determining if a rule is interpretative under § 553, the different factors we have considered above apply.

*facturers Association v. Finch* : "[W]hen a proposed regulation of general applicability has a *substantial impact* on the regulated industry, or an important class of the members or the products of that industry, notice and opportunity for comment should first be provided." 307 F.Supp. 858, 863 (D.Del. 1970) (emphasis added). The exemption of section 553(b)(A) from the duty to provide notice by publication does not extend to those procedural rules that depart from existing practice and have a substantial impact on those regulated. *See Aiken v. Obledo,* 442 F.Supp. 628, 649–50 (E.D.Cal.1977). Our inquiry, therefore, is not whether the rule is "substantive" or "procedural," but rather whether the rule will have a "substantial impact" on those regulated.

### III

■ Did the Notice of Elimination have a substantial impact on the motor carrier industry? The Commission has characterized its former practice of informing competing carriers of the filing of an application for ETA as an "informal custom" and as an "informal, non-mandatory practice." It is quite true that notification is not required under § 10928 and that the practice has never been formalized by a written requirement in the Field Staff Manual or by its adoption in a formal rule-making proceeding. It is equally true, however, that the practice had existed for over forty years. Moreover, the Commission's Field Staff Manual—Part III provides procedures for handling applications for ETA that in practice virtually mandated the notification of pre-existing competing carriers by telephone.[6] Indeed, even were the practice informal, it would still be possible that a change would have a substantial impact. *See, e. g., Pharmaceutical Manufacturers Association v. Finch,* 307 F.Supp. 858 (D.Del.1970); *National Motor Freight Traffic Association v. United States,* 268 F.Supp. 90 (D.C.1967), *aff'd per curiam,* 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968).

The dollar volume of the traffic diverted, or potentially diverted, by grants of emergency temporary authority under the new scheme is substantial. For example, during one month of operation the ETA enabled Ryder Truck Lines to handle a total of 2,257 shipments weighing 6,327,722 pounds with revenues of $485,934.00. When the grants of ETA to Ryder and Texas-Oklahoma Express were subsequently revoked, the Commission noted that "protestants have shown that they can render the motor carrier service involved and that there is no immediate and urgent need for the service authorized." If we assume notification would have supplied the information eventually obtained, the failure to have that information when first deciding these petitions affected substantial amounts of revenue in the motor carrier industry.

Competing motor carriers clearly have the strongest incentive to get accurate information before the Commission when it may act to preempt a part of their services with the grant of ETA to another carrier. There are other means by which the Commission could obtain this information, it is true. But the decision to cease giving notice to pre-existing competing carriers carries the needless risk that the Commission may not obtain all the relevant information it should have. It is a risk fraught with serious economic consequences to those affected.

The Commission argues that the industry's reliance on the past practice was unjustified, citing *British Caledonian Airways, Ltd. v. CAB,* 190 U.S.App.D.C. 1, 5, 584 F.2d 982, 986 (D.C.Cir.1978), in which the court held "[p]revious [agency] practice will only be determinative here if it had been such as to have created a pattern of behavior on which industry members justifiably had come to rely. To prove the existence of

---

**6.** For example, the Manual provides in ¶ 1(d): "The Field Staff *must* determine whether existing motor carriers have the authority to provide the service." (Emphasis in original.) Paragraph 5, entitled "Investigating ETA Applications," states: "When contacting ETA

protestants, obtain the specific authority upon which the protest is predicated . . . .. This information must be reported on form BOp–F–31, or it must be reported that protestant failed or refused to furnish the information."

such established pattern the petitioner must bear a heavy burden . . ..'' The *British Caledonian* court was using that test to determine whether equitable estoppel was warranted, however, not whether a change in agency practice could have a "substantial impact.'' The airlines were arguing that because the Board had proceeded by rule making in previous tariff requirements, they could justifiably expect all tariff requirements to be announced by rule making. That argument was addressed to the court's equitable powers, not to the provisions of the Administrative Procedure Act.

While in the context of APA requirements the motor carriers' reliance must be justified, their burden of proof is not so heavy. Clearly, the showing of forty years' continuous practice satisfies that burden. The Commission argues that regardless of how long the practice had continued, reliance thereon was unjustified, particularly since the Supreme Court's decision in *American Farm Lines v. Blackball Freight Service,* 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). In *American Farm Lines* the Court held that the Commission's rules for granting temporary authority were not *primarily* intended to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion. Nothing said in *American Farm Lines,* however, denies that carriers may reap *some* benefits from these rules. That case involved a grant of temporary authority even though the applying carrier had not provided answers to one of the questions on the application. The Court held that the Commission had sufficient information on which to base its decision, and that competing carriers were provided sufficient information and notification to have enabled them to contest the application. *American Farm Lines* did not involve a change in a longstanding procedure, as is made clear by the Court's language that "it is always within the dis-

cretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it." *Id.* at 539, 90 S.Ct. at 1292 (quoting *NLRB v. Monsanto Chemical Co.,* 205 F.2d 763, 764 (8th Cir. 1953)). That the interest of the carriers in the procedural benefits conferred by the rules was not sufficiently strong to hamper the exercise of administrative discretion does not deny the existence of that interest. Even in *American Farm Lines* the Court noted that the Commission had adequate information before making its decision. The industry was not unreasonable in taking advantage of the notification procedure to ensure that the Commission was adequately apprised. Thus, the industry's reliance on the forty-year-old practice of notifying existing competing carriers, pending ETA applications was not unjustified, and the change in that practice had a substantial impact on the motor carrier industry.[7]

### IV

Finding the issue justiciable even though the particular ETAs have been cancelled, we conclude that § 553 controlled the promulgation of the Notice of Elimination. We therefore grant review and vacate the Notice of Elimination. Should the Commission choose to institute the same or a similar rule in the future, it must comply with § 553.

REVIEW GRANTED.

RULE VACATED.

---

7. Because we hold that § 553 itself requires notice and comment, we need not consider the extent to which common-law notions of fairness may require notice and comment procedures for rulemaking exempt from § 553, as some courts have suggested. *See* K. Davis, *supra* n. 5, § 6.01–8.