**SHELL OFFSHORE, INC. and Shell Deepwater Production, Inc.**

v.

**Bruce BABBITT, Secretary of the Interior.**

No. 98–0853.

United States District Court, W.D. Louisiana, Lake Charles Division.

March 17, 1999.

---

Charles B. Griffis, Liskow & Lewis, Lafayette, LA, James Berry St. John, Jr, Jonathan A. Hunter, Liskow & Lewis, New Orleans, LA, for Shell Offshore Inc. and Shell Deepwater Production Inc, plaintiffs.

Martin J. LaLonde, Geoffrey Garver, Lori Caramanian, U.S. Dept of Justice, Washington, DC, for Bruce Babbitt, Bob Armstrong and Cynthia L. Quarterman, defendants.

### MEMORANDUM RULING

TRIMBLE, District Judge.

Currently before the court are cross Motions for Summary Judgment by Shell Offshore, Inc. and Shell Deepwater Production, Inc. ("Shell") and the Department of the Interior ("DOI") [Docs. 21 and 27 respectively].

#### Facts

Shell is a lessee under numerous offshore federal mineral leases that were issued by and/or administered by the Department of Interior ("DOI"), through its sub-agency, the Minerals Management Service ("MMS"). This dispute involves Shell's royalty payments on crude oil produced from offshore leases comprising Shell's Auger Unit.

Shell began producing from the Auger Unit offshore Louisiana in April 1994. Shell alleges that crude oil produced from the Auger Unit was transported through a common carrier pipeline in a continuous, uninterrupted movement into Louisiana and then on to Shell's refinery in Wood River, Illinois.

Under MMS' royalty valuation regulations, a lessee may deduct the cost of transporting oil from the value upon which it calculates royalty payments. See 30 C.F.R. § 206.105(a), (b)(1). Shell filed a tariff with the Federal Energy Regulatory Commission ("FERC") on March 2, 1994. This tariff was effective April 1, 1994. Shell alleges that FERC established the rate Shell could charge for transporting crude oil through the Auger pipeline. DOI argues that FERC's jurisdiction had not

been established and if FERC did not have jurisdiction, FERC could not establish the appropriate rate.

By letter dated July 7, 1994, to the MMS, Shell requested that the MMS confirm that, in valuing Shell's Auger Unit crude oil production for royalty purposes, Shell was entitled to deduct as transportation cost the tariff rate approved by FERC for the Auger pipeline. In an order dated November 10, 1994, the MMS denied Shell's request.

Shell appealed the order. On August 13, 1998, DOI denied Shell's appeal.

Prior to October, 1994, MMS accepted tariffs filed with FERC in determining whether a lessee qualified for an exception under 30 C.F.R. § 206.105(b)(5).

DOI permits offshore federal lessees that transport crude oil through pipelines that are not owned by such lessees or affiliates of such lessees to deduct the actual, reasonable costs of transportation, which may or may not be the same as the FERC rate, depending on the contract between the parties. 30 CFR § 206.105(a).

### Procedural History

DOI issued Shell's leases under the authority of the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, et seq. Under OCSLA and the lease terms, Shell is to pay royalties on the basis of a specified percentage (usually 16 2/3) of the "value of the production saved, removed, or sold" from the lease. 43 U.S.C. § 1337(a)(1)(A). MMS regulations stipulate that the value of the production for royalty purposes shall not be less than the gross proceeds accruing to the lease for lease production, less applicable allowances. 30 C.F.R. § 206.102(h) (1998). The determination of the applicable allowances is determined, in part, on whether Shell has arm's length or non arms-length transportation contracts. It is not contested that Shell has a non arm's-length contract in this case.

30 C.F.R. § 206.55(b) states that:

(1) If a lessee has a non-arm's-length contract or has no contract, including those situations where the lessee performs transportation services for itself, the transportation allowance will be based upon the lessee's reasonable, actual costs as provided in this paragraph. All transportation allowances deducted under a non-arm's-length or no-contract situation are subject to monitoring, review, audit, and adjustment . . . . .

(2) The transportation allowance for non-arms'-length or no-contract situations shall be based upon the lessee's actual costs for transportation during the reporting period, including operating and maintenance expenses. . . .

30 C.F.R. § 206.51 defines a transportation allowance as "an allowance for the reasonable, actual costs incurred by the lessee for moving oil to a point of sale or point of delivery off the lease, unit area, or communitized area, excluding gathering, or an approved or MMS-initially accepted deduction for costs of such transportation, determined by this subpart."

30 C.F.R. § 206.105 (1998) governs how lessees determine transportation allowances. § 206.105(c)(2)(iv) provides that, in a non-arm's-length transaction, if the lessee is approved to use its FERC-approved tariff as its transportation cost in accordance with paragraph (b)(5) of that section, it should follow the reporting requirements of paragraph (c)(1) of that same section.

30 C.F.R § 206.105(b)(5) states:

A lessee may apply to the MMS for an exception from the requirement that it compute actual costs in accordance with paragraphs (b)(1) through (b)(4) of this section. The MMS will grant the exception only if the lessee has a tariff for the transportation system approved by the Federal Energy Regulatory Commission (FERC). . . . The MMS shall deny the exception request if it determines that the tariff is excessive as compared to arm's-length transportation charges by

pipelines, owned by the lessee or others, providing similar transportation services in that area. If there are no arm's-length transportation charges, MMS shall deny the request if: (1) No FERC or State regulatory agency cost analysis exists and FERC .... has declined to investigate pursuant to MMS timely objections upon filing; and (ii) the tariff significantly exceeds the lessee's actual costs or transportation as determined under this section.

This is known as the "FERC exception."

The preamble to 30 C.F.R. § 206.105(b)(5) explained, "where a lessee has a tariff approved by FERC or a State regulatory agency, it is unnecessarily burdensome and duplicative to recompute costs." 53 F.Reg. at 1261 (January 15, 1988). Shell has a "value determination letter" issued by MMS dated December 1, 1988. From the promulgation of the 1988 regulation until September of 1994, the MMS routinely allowed federal OCS lessees to deduct the FERC tariff rate as the cost of non-arm's-length transportation.

Under FERC practice, when a tariff is filed, FERC automatically accepts it unless a protest is filed, but DOI argues that this does not equal approval of the tariff. DOI argues that FERC must first issue an affirmative declaration that it has jurisdiction over a pipeline to have the authority to "approve" a tariff. 18 C.F.R. § 385.207(a)(2).

Shell argues that, effective April 1, 1994, FERC approved a tariff published by Shell for the Auger pipeline. By a letter to the MMS dated July 7, 1994, Shell requested that MMS confirm that Shell was entitled to deduct as a transportation cost the tariff

rate approved by FERC. In an order dated November 10, 1994, MMS denied Shell's request. MMS stated in that order that FERC's decision in *Oxy Pipeline Inc.,* 61 FERC 61,051 (1992) demonstrated that FERC "renounced jurisdiction over oil pipelines transporting oil solely on or across OCS," and therefore Shell's FERC tariff could not be used in lieu if an "actual cost" transportation calculation. In *Oxy Pipeline,* FERC disclaimed jurisdiction over a pipeline segment that moved crude oil from one location on the OCS to another location on the OCS, because FERC concluded that this did not constitute "interstate commerce" under the Interstate Commerce Act.[1]

Shell appealed the order to the Director of the MMS. Shell argued that *Oxy Pipeline* did not apply because Shell's Auger Unit production did not remain on the OCS, but rather moved in a continuous stream from the federal OCS to onshore locations.[2]

On January 18, 1997, the Associate Director of the MMS issued a decision granting the appeals filed by Shell and other OCS lessees.[3] The Associate Director found that: (1) the jurisdictional determination in *Oxy Pipeline* could not be used as a blanket determination for all OCS pipelines, and that MMS must petition the FERC for an individual jurisdictional determination regarding each pipeline. The Associate Director further found that MMS had not, as required by DOI's royalty valuation rules in 30 C.F.R. § 206.105(b)(5), analyzed whether the tariffs were excessive as compared to arm's-length transportation charges, nor had MMS filed with FERC timely objections to

---

**1.** See 49 U.S.C. § 60502; Revised Interstate Commerce Act, Pub.L. No. 95–473 § 4(C), 92 Stat.. 1337, 1470 (1978).

**2.** Although Shell states in its brief that it is uncontested that the production for the Auger Unit flows in an uninterrupted, continuous stream to points onshore, it is clear from

DOI's brief that they disagree with this statement.

**3.** A.R. Tab 4. The Administrative Record ("A.R.") consists of two volumes which have been made a part of the record. The first volume is designated "AR". The second volume is the Supplemental Administrative Record ("SAR").

the tariffs. The MMS decision remanded several appeals, including Shell's, to MMS's Royalty Valuation Division ("RVD") and ordered RVD to petition FERC for individual jurisdictional determinations for each pipeline.

RVD did not conduct such a valuation study. Instead, on February 4, 1998, Shell received a final decision issued *sua sponte* by Interior Assistant Secretary Armstrong [4] denying Shell's appeal based upon *Ultramar, Inc. v. Gaviota Terminal Company*, 80 FERC 61,201 (1997). In *Ultramar*, FERC ruled that it did not have jurisdiction over the movement of crude oil from federal lands offshore of the State of California to a refinery located within the State of California. DOI reasoned that because the oil was transported from offshore to the State of California and remained within California, the transportation was intrastate, therefore there was no jurisdiction. DOI found that Shell had not proven that its oil moved beyond the adjacent state, therefore this was not interstate transportation and FERC was without jurisdiction.

Shell argued then, as it does now, that it had provided uncontroverted evidence that the Auger Unit oil traveled in a continuous and uninterrupted stream from the OCS offshore Louisiana to Shell's refinery in the State of Illinois [5]. Shell filed a request for reconsideration based upon this argument, but DOI had not issued a ruling on the request for reconsideration prior to this law suit being filed on May 7, 1998. On August 13, 1998 [6], DOI denied the request for reconsideration. In that decision, DOI acknowledged that Shell had established movement of the oil to Illinois, but still rejected Shell's request to use the FERC tariff in its calculations of transportation costs. DOI stated that FERC had "affirmatively and demonstrably renounced jurisdiction over certain OCS pipelines." [7] The MMS would not permit the use of FERC tariffs in lieu of the calculation of actual transportation costs unless Shell petitioned FERC and received an affirmative determination of FERC jurisdiction.

On December 8, 1998, DOI issued a "Dear Payor" letter that announced the general institution of the requirement that offshore lessees petition FERC for a jurisdictional determination before requesting to use FERC tariffs to calculate oil transportation costs.

Shell challenges DOI's decision on several grounds:

(1) DOI allegedly acted contrary to its own regulations;

(2) DOI allegedly unlawfully departed from agency precedent and policies;

(3) DOI's decision allegedly affects a substantive rulemaking without proper Administrative Procedure Act ("APA") notice and comment, 5 U.S.C. § 553; and

(4) FERC does have jurisdiction over this pipeline.

## Argument and Law

The Supreme Court has interpreted the standards which should be applied in considering the entry of summary judgment. . . . The Court has stated that Fed. R.Civ.P. 56(c) mandates summary judgment in any case where a party fails to establish the existence of an element essential to his case on which he bears the burden of proof.[8] A complete failure of proof on an essential element renders all other facts immaterial because there is no longer a genuine issue of material fact.[9]

---

4. A.R. Tab 3.

5. Shell included additional documentation of the movement of the oil to Illinois in its request for reconsideration. A.R. Tab 2.

6. A.R. Tab 1

7. DOI relied upon *Oxy Pipeline, Ultramar* and *Bonito Pipeline Co.*, 61 FERC 61,050 (1992).

8. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

9. *Id.*

Rule 56(c) requires the district court to enter summary judgment if the evidence favoring the nonmoving party is not sufficient for the jury to enter a verdict in his favor.[10] When the moving party has carried his burden under Rule 56(c), his opponent must present more than metaphysical doubt about the material facts.[11] A claim that further discovery or a trial might reveal facts which the plaintiff is currently unaware of is insufficient to defeat the motion.[12]

In the summary-judgment context, the rules governing burden of proof are critically important. The moving party bears the burden of establishing that there are no genuine issues of material fact. (footnote omitted) To satisfy this burden, the moving party may either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving party's claim or defense. (footnote omitted) Once the moving party makes that showing, however, the burden shifts to the nonmoving party to show that summary judgment is not appropriate. (footnote omitted) The nonmoving party cannot discharge the burden by referring to the "mere allegations or denials" of the nonmoving party's pleadings; rather, that party must, either by submitting opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing that a genuine issue exists.[13]

Under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, the decision from the administrative proceeding is unlawful and should be set aside if it is:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance or procedure required by law.

Shell argues that each of these grounds for reversal applies in this case.

DOI submits that where an agency's legal determination involves interpretation of its own regulations, the courts are to give substantial deference to that agency's views.[14] While Shell does not dispute that federal agencies are generally entitled to deference, Shell argues that such deference is only appropriate when the decision complies with the agency's regulations and fundamental principles of administrative law. For example, Shell states that an agency is not entitled to deference if it has failed to follow promulgated regulations[15], if there is no rational connection between the facts presented in the agency's judgment[16], if it has failed to consider all relevant factors in applying its regulations[17], if

---

**10.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

**11.** *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

**12.** *Woods v. Federal Home Loan Bank Bd.,* 826 F.2d 1400, 1414–15 (5th Cir.1987). *Washington v. Armstrong World Industries, Inc.,* 839 F.2d 1121 (5th Cir.1988)

**13.** *Lavespere v. Niagara Machine & Tool Works, Inc.,* 910 F.2d 167 (5th Cir.1990).

**14.** *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Mesa Operating*

*Limited Partnership v. U.S. Dept. of Interior,* 931 F.2d 318, 322 (5th Cir.1991), cert. den, 502 U.S. 1058, 112 S.Ct. 934, 117 L.Ed.2d 106 (1992).

**15.** *United States v. Nixon,* 418 U.S. 683, 694–95, 94 S.Ct. 3090, 3100–01, 41 L.Ed.2d 1039 (1974).

**16.** *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins.,* 463 U.S. 29, 56, 103 S.Ct. 2856, 2873, 77 L.Ed.2d 443 (1983).

**17.** *Id.* at 43, 103 S.Ct. at 2867.

it has ignored relevant evidence before it [18], or if it has departed from established procedures [19]. Likewise, an agency's new interpretation of its regulation is entitled to less deference than its original interpretation.[20]

DOI posits that the fundamental question in this case is whether DOI's interpretation of its own regulation, 30 C.F.R. § 206.105(b)(5), is "plainly erroneous or inconsistent with the regulation [21]." This regulation allows DOI to grant an exception from the requirement that the lessee use actual transportation costs if the lessee has a tariff that has been approved by FERC. The issue now before the court is what "approved by FERC" means in the context of transportation costs. DOI argues that: "approved by FERC" means that, in certain circumstances, a lessee must petition FERC under 18 C.F.R. § 385.207(a)(2) and receive an affirmative determination that FERC has jurisdiction over the pipeline at issue.

As stated hereinabove, prior to 1994, MMS did not require that lessees demonstrate that FERC had affirmatively demonstrated that FERC had jurisdiction over a pipeline tariff for MMS to consider the tariff "FERC approved." MMS accepted the lessee's filing of a tariff with FERC, that FERC did not specifically reject, as satisfying the requirement of § 206.105(b)(5). DOI submits that several opinions questioned this policy [22].

DOI cites three cases in support of its position. None of these cases are identical factually. In *Oxy Pipeline, Inc.*, 1992 WL 276147 (F.E.R.C.), 61 FERC ¶ 61,051, Oxy sought a declaratory order in which it asked the Commission to declare that it had no jurisdiction under the Interstate Commerce Act [23] ("ICA") over certain pipelines owned by Oxy in the OCS waters off of Louisiana. Oxy averred that its pipelines crossed no state lines, that it had no knowledge of the ultimate destination of the oil and that no non-owner of the pipelines had ever expressed an interest in shipping oil over the pipelines. In interpreting the jurisdictional issue of whether the ICA applied to OSC pipelines, FERC concluded that the ICA did not apply to pipelines engaged in the transportation of oil on or across the OCS.

In *Bonito Pipeline Co.*, 1992 WL 276148 (F.E.R.C.), 61 FERC ¶ 61,050, the Bonito Pipeline was an OCS crude oil pipeline with delivery to onshore points. In this case FERC held that the ICA specifically excluded transportation which was wholly within one state.

In *Ultramar, Inc*, 1997 WL 612369 (F.E.R.C.), 80 FERC ¶ 61,201, Ultramar was a refining company with refining and retail markets located almost exclusively within the state of California. FERC held that it lacked jurisdiction because Ultramar's shipments were purely intrastate.

In the case at bar, in affidavits submitted by Shell, testimony has been admitted that oil enters the Auger pipeline and that oil continues from the Auger unit on the OCS to Shell's Wood River refinery in Wood River Illinois, via the following pipeline systems: from the Auger platform via Shell's pipeline to the Bonito and/or Eugene Island pipeline systems; from the Bonito pipeline system to Ship Shoal Block

18. *Id.,* at 42–43, 103 S.Ct. at 2866–67.

19. *Diaz–Resendez v. INS*, 960 F.2d 493 (5th Cir.1992).

20. *Marathon Oil Co. v. Andrus*, 452 F.Supp. 548 (D.Wyo.1978); *Amoco Production Co. v. Andrus*, 527 F.Supp. 790 (E.D.La.1981).

21. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

22. See *Oxy Pipeline, Inc.* 61 FERC ¶ 61,051 (1992); *Bonito Pipeline Co.*, 61 FERC ¶ 61,050 (1992), *aff'd sub. nom.*, *Shell Oil Co. v. FERC*, 47 F.3d 1186 (C.A.D.C.1995); *Ultramar, Inc. v. Gaviota Terminal Co.*, 80 FERC ¶ 61,201 (1997).

23. 49 U.S.C. § 1 et seq. (1976).

28, and from the Eugene Island pipeline system to Calliou Island; from Ship Shoal Block 28 through the Ship Shoal Pipeline system to St. James, Louisiana, and from Calliou Island through Texaco's pipeline system to St. James, Louisiana; from St. James, Louisiana, through the Capline/Capwood system to the Wood River Refinery in Illinois.[24] The crude oil that is transported in this manner is not refined prior to its delivery to the Wood River Refinery. Shell argues that this constitutes a continuous and uninterrupted flow from the Auger unit to Illinois. DOI argues that this constitutes shipment on or across the OCS.

In § 1(1) of the ICA, it provided in pertinent part that the ICA "shall apply to common carriers engaged in .... [t]he transportation of oil ... by pipeline .... from one State or Territory of the United States ... to any other state or Territory of the United States, ... to any other State or territory to another place in the same territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any such place in the United States to or from a foreign country, but only insofar as such transportation takes place within the United States."[25]

Although the OCSLA, at 43 U.S.C. § 1333(a)(1), makes it clear that federal law applies to the OCS and the ICA comes within that provision, this alone does not make the ICA applicable to the OCS.[26] § 1333(a)(1) also provides that the OCS is to be treated "as an area of exclusive federal jurisdiction located within a state" for the purposes of applying federal laws.[27] In *Oxy* FERC specifically held that the ICA would not apply to transportation within such a federal enclave *unless the facilities exited the enclave and the oil moved in interstate commerce* (emphasis added).

In *Ultramar*, supra, Ultramar claimed ICA jurisdiction based upon its distribution of refined products from its Wilmington refinery to points out-of-state. The oil was broken down at the refinery and was transformed into different products which were then marketed to other states. FERC found that the refining of the oil caused a break in the transportation that resulted in any subsequent transportation of refined products as being a separate movement. Even if that subsequent movement was interstate, it has no bearing on the first movement from offshore because it was not a continuous, uninterrupted flow.[28]

A factually similar case is *South Timbalier Pipeline Systems*, 1984 WL 58808 (F.E.R.C.), 29 FERC ¶ 61, 345. FERC held in *South Timbalier* that Chevron had violated the ICA by not filing the appropriate tariff. South Timbalier was an offshore pipeline which transported oil from the OCS through a treatment facility at Pass Fourchon, Louisiana, the oil entered the Cal–Ky pipeline and was commingled into a common stream with oil from other production areas and was then carried to either Empire, Louisiana, or to the refinery at Pascagoula, Mississippi. FERC found that the transportation of the oil from the OCS to Pascagoula was continuous, without material interruption and found that FERC had jurisdiction.

From the very beginning of this proceeding, DOI has relied upon FERC's decisions as the basis for denying Shell's request to use the FERC tariff to calculate crude transportation costs. Shell argues that there is no rational connection between the FERC rulings that cause the

---

24. See affidavits of Mark D. Bowen, Senior Pipeline Representative for Shell, and of Steven D. Herrington, Lease Crude Oil Trading Manager, AR 2.

25. 49 U.S.C. § 1(1) (1976); now 49 U.S.C. § 15301 (eff.1995).

26. *Oxy Pipeline,* 1992 WL 276147, *1 (F.E.R.C.)

27. *Id,* at *1

28. *Ultramar,* at *2

MMS to create the new requirement that Shell must petition for an affirmative decision of FERC's jurisdiction and the uncontradicted evidence that Shell presented to DOI. The court agrees and finds that *Oxy* and *Ultramar* are factually distinguishable and are not applicable to this case.

In *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), the Supreme Court reversed a decision by the National Highway Transportation Safety Administration to rescind a "passive restraint" requirement for automobiles. The Court reasoned that, in reaching its decision, an agency must examine relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." 103 S.Ct. at 2866–67.

■ This court finds that there is no rational connection between DOI's reliance upon the findings in *Oxy* and *Ultramar*. Shell introduced evidence that its oil was transported from the OCS through Louisiana to a refinery in Illinois. This constitutes interstate travel. By issuing the same form letter to all offshore lessees, DOI failed to adequately consider the evidence being submitted by Shell. This court agrees with the Tenth Circuit in finding that DOI has a duty to analyze all relevant factors to the issue at hand. See *Woods Petroleum Corp. v. DOI*, 47 F.3d 1032, 1038 (10th Cir.1995) (DOI decision reversed because DOI rejected a proposed communitization agreement without considering the express criteria for evaluating such agreements.) Accordingly, this court finds that DOI's decision was arbitrary, capricious and an abuse of discretion.

Pursuant to 30 C.F.R. § 206.105(b)(5), Shell is entitled to use the FERC tariff rate as a basis for transportation costs if the tariff has been approved by FERC and MMS has not made the determination that the tariff rate is excessive as compared to transportation costs incurred by third parties not affiliated with the pipeline. Instead, DOI has denied Shell the right to use the tariff rate because Shell did not petition FERC under 18 C.F.R. § 385.207(a)(2) (1997) and received a determination that FERC has affirmative jurisdiction over the pipelines. The MMS acknowledged in this proceeding that "the preamble regarding 30 C.F.R. § 206.105(b) at 53 F.R. 1,184 (1988), implies that a published tariff, i.e., a tariff filed with FERC and not subsequently rejected by FERC satisfies the requisite "approved" tariff."

Shell filed for and obtained a published tariff rate from FERC (AR Tab 16–2). MMS did not file a protest with FERC concerning the rate or question FERC's jurisdiction. The Associate Director noted in his ruling that the MMS did not make timely objections to the filing. (AR Tab 4). FERC Chair Moler advised the MMS that if no protest is filed, it is FERC's practice to approve the filing without further review. (SAR Tab 66). The court finds that Shell has a valid, "approved" tariff.

DOI argues that the tariff is not "approved" until a tariff had been obtained and FERC affirms its jurisdiction. This "affirmation" is not required pursuant to 30 C.F.R § 206.105(b)(5) which sets forth the procedures for determining a transportation allowance. DOI is attempting to impose a new requirement which is not present in regulations, which contradicts the establish policy for FERC tariffs. This decision also departs from agency precedents.[29]

MMS policy had been established when, in 1994, DOI began to rely upon *Oxy*, *Bonito* and *Ultramar* to deny these tariffs. Shell argues that DOI should have changed the regulations rather than denying all offshore lessees' tariff requests.

---

**29.** As noted earlier, FERC tariffs had been routinely accepted for years unless they were contested when filed.

Shell further argues that by denying the lessees requests to use FERC tariffs in lieu of actual cost determinations, DOI had, in effect, adopted a new, unwavering practice that "represents a departure from its regulations and prior practices and that leaves no room for agency discretion." [30] DOI is challenging lessees to conform or file litigation. Shell submits that this constitutes a "binding rule" and triggers the notice and comment requirements of the APA.

 In *Phillips Petroleum Company v. Johnson,* 22 F.3d 616 (5th Cir.1994), the court rejected MMS's argument for an application of the procedural rule exemption from APA notice and comment. The court held that: "[W]hen a proposed regulation of general applicability has a substantial impact on the regulated industry, or an important class of members or the products of that industry, notice and opportunity for comment should first be provided." [31] The court agrees and finds that the notice and comment procedures to the APA are applicable to this change in policy.

Shell goes on to argue, however, that Shell is entitled to deduct the tariff rate applicable for that portion of the Auger Crude that is refined in Louisiana. The court's findings above are based on the inapplicability of *Oxy, Bonito* and *Ultramar.* These cases are inapplicable because the crude is transported in a continuous, uninterrupted movement to the refinery in Illinois, constituting interstate travel. Transporting the crude to a refinery in Louisiana is not interstate and the holding in *Ultramar* is applicable to crude transported from the OCS to Louisiana. The tariff is not applicable to this portion of the crude.

### Conclusion

In accordance with the foregoing and for the reasons set forth herein, the court finds that there are no genuine issues of material fact. DOI's Motion for Summary Judgment will be denied. Shell's Motion for Summary Judgment will be granted in art and denied in part:

The court will render a judgment setting aside the decision by DOI in MMS–94–0697–OCS on the grounds that the decision is arbitrary, capricious, an abuse of discretion, and otherwise contrary to law. The court will set aside MMS order MMS–94–0697–OCS and enter an order enjoining the MMS and/or DOI from enforcing that order.

The court will not issue an order declaring that Shell may use the applicable FERC tariff rate to calculate crude allowances for crude oil that is refined in Louisiana, but will issue an order allowing the FERC tariff rate to be used on that portion of the Auger Unit oil which is transported to the refinery in Illinois.

---

**30.** The universal applicability was confirmed by the "Dear Payor" letter issued in 1998.

**31.** Citing *Brown Express, Inc. v. United States,* 607 F.2d 695 (5th Cir.1979).